CORRECTED MEMORANDUM OF DECISION
By petition filed July 11, 1997, the Department of Children and Families (DCF)) seeks to terminate the parental rights of the mother and father of the minor child, Samantha D., born August 29, 1993. The mother of the minor child is Crystal D. and the father is Gerald H.
The petition is brought in a single count against mother and three counts against father. DCF claims that both mother and father have failed to achieve such degree of personal CT Page 9399 rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of their child as provided by General Statutes Section 17a-112 (c)(3)(B). As to father, the petition also alleges that Gerald H. has failed to maintain a reasonable degree of interest, concern or responsibility for the child and has abandoned the child as that term is defined by Section 17a-112 (c)(3)(A): and further, that the father has no ongoing parent-child relationship with the minor child as that term is defined by Section 17a-112 (c)(3)(D). The petition further claims that the foregoing conditions have existed for more than one year.
DCF claims that the child was originally removed from mother's care on a 96-hour hold because mother and child were homeless and living in a car. The court issued an Order of Temporary Custody (OTC) on April 19, 1995 which was vacated on that same day and reinstated on May 25, 1 995, after mother and child were again found to be homeless. On October 5, 1995. the child was adjudicated as "uncared for as a result of being homeless and was committed to the custody of DCF for a period not to exceed twelve months. The commitment was extended until October 5, 1997, and for a second time until October 5, 1998.
A trial on the petition was held on March 23, 1998 and March 27, 1998. Although the father was served in hand, and, despite numerous efforts by both his attorney and the social worker to contact him, he failed to appear and was found in default of the petition by the court on November 3, 1997. Father also failed to appear for the trial. Petitioner presented four witnesses including Joan Prior, M.S.W., the child's therapist. David Mantell, Ph.D., the court appointed evaluator of mother and child, Sherilyn Barao, a parent aide, and Barbara O'Brien, DCF social worker The mother testified but called no additional witnesses. Seven exhibits were introduced into evidence, including previous letters and reports of the witnesses, Dr. Mantell's written report of his evaluation including an addendum, a service agreement between the mother and DCF concerning the mother's three younger children dated January 27, 1998, the DCF Social Study and an update, and finally, the court ordered expectations dated October 3, 1996.
The court makes the following findings of fact by clear and convincing evidence based on the foregoing record and the contents of the court file of which the court takes judicial CT Page 9400 notice.
 I FACTUAL FINDINGS
Crystal D.
The history of this case is substantially an account of the sad circumstances of the life of Crystal D., the young mother of Samantha and the product of an all too brief childhood overshadowed by extreme neglect and abuse. The evidence revealed that at her present age of eighteen (18), Crystal is the mother of four children, Samantha, age 4, born August 29, 1993; Kayla, age 2, born April 1, 1996, T.J., age 1, born March 10, 1997; and Jacob, age 4 months, born January 9, 1998. All ages are as of the date of trial.
Crystal left school in the eighth grade, has never been married and her four children have three different fathers, none of whom are involved in the care of their children. Samantha was born to Crystal when she was only thirteen years old. Since that time Crystal has moved more than a dozen times, on occasions has been homeless and has lived at other times in very unstable conditions. Samantha was born at 32 weeks gestation and weighed only three (3) pounds, fourteen (14) ounces. She will be five years old on August 29, 1998. She has been in foster care for over three years of her young life. DCF specifically faults Crystal's chronic inability to secure adequate housing or income, to participate in individual counseling and complete parenting counseling as evidence of her failure to rehabilitate.
Although Crystal has fought sometimes valiantly to be a mother to all her children, given her young age, her personal history of abuse and neglect, and the fact that she had three additional children in the two years immediately preceding the trial on this petition, the task of caring for all of her children has been overwhelming. While she expresses the desire to regain custody of Samantha, there is clear and convincing evidence that she has not been in a position to meet Samantha's essential needs and the court finds no reason to believe that she will be able to do so within a reasonable time frame.
The factual history of this case is framed by the reasonable and extensive efforts that have been made by DCF, its service providers. and this court, to achieve reunification of Samantha CT Page 9401 and Crystal.
Prior to the birth of Samantha, Crystal was committed to DCF which commitment was eventually revoked and Crystal was under an order of protective supervision when Samantha was born on August 29, 1993. While Crystal was pregnant with Samantha. DCF filed a motion to reopen and modify the disposition of protective supervision as to Crystal and sought commitment so that Crystal and her baby could be placed at the St. Agnes Family Center (St. Agnes). Although the referral was made, Crystal refused placement and her case was closed. Samantha was delivered one month later.
Since before the time of the original commitment on October 5, 1995, DCF made reasonable efforts to place Crystal and Samantha together. At the time the OTC was re-ordered on May 25, 1995, the court memorandum noted that it was being reinstated with the understanding that DCF would try to place mother and child together. These efforts were repeatedly frustrated by Crystal's failure to cooperate with placement efforts and follow through with services offered. At a court hearing held on August 10, 1995, DCF represented that it was continuing to explore placing Crystal and Samantha together and was planning to investigate the Thames River Program. It turned out that they were not eligible for that program because Crystal had not yet reached the minimum age of eighteen (18).
At the time of Samantha's original commitment on October 5, 1995, the only specific expectation set by the court was that Crystal was to cooperate with the recommendations of the Community Housing Assistance Program (CHAPS), a DCF sponsored independent living program, so that she could meet DCF's longstanding expectation that she have adequate income and provide Samantha a safe place to live. It is worth noting that at the commitment hearing, DCF waived the six-month waiting period for a motion or petition for revocation of the commitment should the reason for the commitment, homelessness, no longer exist.
Also, in October 1995, a second referral was made to St. Agnes on Crystal's behalf because she was pregnant with Kayla who was born on April 1, 1996. In December 1995, Crystal's mother, Rhonda E., was to sign a voluntary commitment of Crystal, then age sixteen (16), and she was to be placed in foster care as an interim measure. An appointment was made for this purpose and Crystal and her mother failed to keep the appointment. Crystal was refused placement at St. Agnes after telling the staff at her CT Page 9402 interview that she believed DCF to be a "black market for babies." The effort to involve Crystal in the CHAPS program also failed because Crystal was unwilling to allow herself to be committed to DCF, to be in school or be employed and participate in a life skills class, all of which were requirements of the program. During the 1995-96 time period, the Department of Social Services (DSS) also worked with Crystal in an effort to find her a stable place to live.
In May 1996, there was a case status conference for the purpose of setting what was to become formal court-ordered expectations. A report from the Children in placement monitor presented at the conference suggested that Crystal had refused all services except prenatal care for her second child, Kayla, born April 1, 1996. In May 1996, expectations were drafted which included maintaining appointments set by or with DCF, keeping DCF informed of her whereabouts, visitation with Samantha, participating in individual and parenting counseling, securing or maintaining adequate housing and income and having no involvement with the criminal justice system.
A petition for extension of Samantha's commitment was filed on September 5, 1996. Mother was served in hand and father by publication giving notice of a hearing to be held on October 3, 1996. Neither parent appeared at the scheduled time and date. At the hearing, the extension petition was granted and the court indicated that it would only make a finding that continuing efforts toward reunification were appropriate if Crystal signed the expectations set by the court on or before October 17, 1996. On the latter date, although Crystal was not present, her attorney and guardian ad litum appeared with signed expectations and indicated Crystal's agreement with an extension of the commitment for a period not to exceed twelve months. The expectations were the same as those originally drafted by the parties.
A second extension petition was filed on July 11, 1997. Mother was again served in hand and father by abode service giving notice of a hearing to be held on September 4, 1997. Both parents failed to appear but were represented by counsel. Father's counsel reported that his client had not contacted him prior to the hearing. As a result of the hearing the commitment was extended until October 5, 1998.
Crystal's living situation has been unstable since the time CT Page 9403 of Samantha's birth. Although she and Samantha originally lived with maternal grandmother, Rhonda E., they moved out to live with Gail D., maternal great grandmother, because Rhonda E. was dealing drugs. In March 1995, Crystal and Gail D, had a falling out and Crystal moved with Samantha. On April 16, 1995, DCF found that Crystal and Samantha were homeless and living in a car and invoked a 96-hour hold. On April 19. 1995, an OTC was issued and vacated later the same day when mother reportedly found appropriate and stable housing. A second OTC was entered on May 25, 1995, when information at a court hearing revealed that Crystal and Samantha were again homeless and living in a variety of places. There were no appropriate relatives available for them to live with and so Samantha was placed in foster care. Shortly after the latter OTC, Crystal moved in with her father but was arrested for assaulting him and placed in juvenile detention on June 12, 1995. Crystal was subsequently arrested again for stealing a car and making harassing telephone calls. (Petitioner's Exhibit 6.)
On September 9, 1996, Crystal moved to DSS shelter housing for sixty (60) days. On November 11, 1996, she moved back to the home of Gail D., the maternal great grandmother. Crystal thereafter left Gail D.'s home because Deborah D., her maternal aunt, was also living there and abusing drugs. Crystal moved into the home of her boyfriend's mother and stepfather and requested that they be licensed as foster parents for Samantha. Following an argument, Crystal, her boyfriend (Todd G.) and Kayla moved back in with Gail D. on January 7, 1997. Although Crystal had been previously awarded Aid to Families with Dependent Children (AFDC) benefits by DSS, they were withdrawn in May 1997 because of improper housing. In 1996 and 1997, in addition to moving in and out of Gail D.'s home several times, and in and out of the home of Todd G.'s parents, Crystal also lived with her father at his rooming house; with an employer with whom she had a live in house cleaning position for a short time; back to her father's apartment or room; then with Erica A., a friend, for one month; an apartment with Todd G. from which they were evicted; and at the apartment of Todd G.'s friend. At the time of trial, Crystal had been living with Gail D., since January 22, 1998. Although Crystal turned eighteen (18) in September 1997, as of the time of trial in March 1998, she claimed she was still trying to get out of Enfield, was in contact with Barbara Titus from DSS about finding alternative living arrangements and had saved $1090.00 for a down payment on an apartment. Although she had been getting AFDC, she let those benefits lapse due to her own inaction and CT Page 9404 claimed the lapse did not affect the care of her children.
Although Crystal was living with Gail D. and her three children at the time of trial, relative placement for Samantha has not been a viable option because both Rhonda E. and Deborah D. have also lived with Gail D. off and on in the past. Traditionally, Crystal has been unwilling to remain there when either of these women have been in residence because they both have a history of chronic substance abuse.
Despite the fact that DCF and several service providers, including her current parent aide, have urged Crystal to engage in individual therapy to deal with her own history of abuse and the impact that may have on her own ability to parent, Crystal has refused to do so even after it became a court-ordered expectation on October 3, 1996. DCF scheduled intake appointments at Counseling and Support Connections (CSC) in Enfield, Connecticut, on 12/6/96, 12/13/96, and 1/10/97 all of which she failed to attend. After she resumed working with a parent aide in February 1997, she attended an intake appointment for individual counseling on April 30, 1997, but failed to show for her next scheduled appointment on May 13, 1997, and had not rescheduled another appointment at the time of trial. Since October 1995, when Samantha was first committed, Crystal only attended an intake evaluation for individual counseling and two parenting classes. Although referrals had been made to the Young Mothers Program in Enfield, Crystal attended only twice, both times in October 1997, and then walked out and refused to return because one of the women who provides childcare there said something negative about her brother. She later claimed as an additional reason for not attending was that Gerald H.'s wife was in the group. She presently is willing to attend a Parenting Under Stress program but is unwilling to deal with her childhood in individual counseling because she does not want to dwell on the past. DCF made a referral for the Parenting Under Stress program in February 1998.
Crystal knew that DCF had given her an ultimatum in October 1996, that she had six months to show that she was making significant progress on her expectations or DCF would file a termination petition. Although at the time of trial, she had earned her GED, was employed, and was planning to begin classes to train as a medical assistant in April 1998, and was working closely with a parent aide, Crystal substantially failed to meet her court-ordered expectations. CT Page 9405
A parent aide worked with Crystal and Samantha from November 1993 to September 1994. In December 1994, DCF made another referral for parent aide services which ended when Crystal moved out of her grandmother's house in March 1995. She again began receiving parent aide services in February 1997, which were ongoing at the time of trial. Sherilyn Barao is a parent aide from CSC who worked with Crystal for several months in 1997 and at the present time. As she testified, Crystal must address her past before she can adequately parent her children. Although Crystal is working hard with the three young children in her care and appears to listen carefully, she does not always follow through. Ms. Barao is concerned about Crystal's ability to also care for a four or five year old in addition to her three very young children along with everything else she is doing.
Barbara O'Brien, a DCF social worker who has worked with Crystal since October 1996, testified about the extensive services offered or provided to Crystal and her children. The court finds that her testimony as well as the "Social Study for Termination of Parental Rights" (Petitioner's Exhibit 6) and the "In Court Review (Petitioner's Exhibit 5) document that these services have included: parent aide services (Coalition for Children) and/or intensive family preservation services; placement in St. Agnes or CHAPS (either of which would have allowed her to provide a safe and stable living arrangement for both herself and Samantha); the Young Mother's Program at CSC; family counseling with Samantha at CSC; parenting classes and parenting counseling through New Directions; individual therapy at CSC: mentoring services through the Big Brother/Big Sister program; transportation services; child care services; child protection team services at CSC; visitation; DCF case management and planning services. In addition, DCF has investigated other placements for Crystal and Samantha together for which Crystal did not qualify for one reason or another, including the Thames River Project in Norwich, Interim House in Winsted, Youth Continuum in New Haven and The Bridge in West Hartford.
During the period of Samantha's commitment, Crystal has had varying levels of visitation including unsupervised and overnight visits. In the February-March 1997 time frame, Samantha began exhibiting regressed behaviors. Unsupervised visits were subsequently reduced from three times per week to twice a week in November 1997. After Crystal's fourth child (Jacob) was born on January 9, 1998, supervised visits were instituted because of CT Page 9406 Samantha's continuing behavioral issues and the uncertainty of a location for the visits, as mother was in the process of moving. In fact, the first week after Jacob was born, the visiting nurse had trouble locating Crystal and the baby. Various providers reported conflicting versions from Crystal as to where she was living. At the time of trial, only one supervised visit per week was taking place. Crystal was living with Gail D. (maternal great-grandmother) at the time of the trial and was in search of apartment now that she w as eighteen (18) and had set aside money for a security deposit. Gail D.'s home has not worked out in the past as a long-term living arrangement both because of Crystal's apparent inability to get along with her on a long-term basis and ongoing safety issues involving the maternal grandmother (Rhonda E.) and maternal aunt (Deborah D.), both of whom have histories of substance abuse and criminal activity and who continue to reside in the home from time to time. There was no evidence presented at trial of any relative who was a viable placement option for Samantha.
At the time of trial, Crystal had entered into a service agreement with DCF concerning her three youngest children which was entered into evidence as Petitioner's Exhibit 4. The service agreement resulted from Crystal's apparent failure to follow through with medical appointments, the visiting nurse and the parent aide and continuing concern about Crystal's living arrangements.
Dr. David Mantell evaluated Samantha and Crystal on June 18, 1997. His written report was entered into evidence as Petitioner's Exhibit 2. He concluded that Crystal "presents with a serious personality disorder that impairs her ability to develop and discharge average/normal range parenting responsibility. Her behavior is strongly self-defeating and her rehabilitative prospects are poor." He recommended that Crystal be given "a time limited ultimatum or to then consider Termination of Parental Rights." His recommendation was influenced by his assessment of Samantha who he found to be "developing a reactive attachment problem" (RAD). He also found that Crystal was then in the midst of a fourth unplanned pregnancy, has a severely chaotic and disabling family history "with limited insight and with a guarded to poor prognosis currently."
As Dr. Mantell testified at trial, Crystal does not have the ability to meet Samantha's needs for permanency, stability, CT Page 9407 parental competency and emotional relationship; Crystal keeps having more children before developing the skills to deal with the first one; she has demonstrated a persistent immaturity in her relationships and her fundamental behaviors, e.g. failure to stay in one place, stop getting pregnant, stop involving herself with unsuitable and unstable men, develop relationships with the children in her care, begin accepting external supports, successfully and consistently meet with professionals who can help her do what needs to be done for her children, and commit herself to meeting court expectations. In terms of the ultimatum he referred to in his report, he thought that Crystal should be given three more months (from June 1997) to demonstrate her commitment to meeting court expectations. As he stated, employment and stable housing would be insufficient to prove Crystal has turned the corner and stabilized her life unless she was also addressing the relationship and psychological issues that he previously identified. At trial, Dr. Mantell expressed the view that the three month period he had in mind at the time of the June 1997 evaluation had long since come and gone and that Crystal's actions and inaction since that time further demonstrated her emotional immaturity and inability to meet Samantha's needs at the present time or to develop the skills to do so at any time in the foreseeable future. Perhaps one of his more telling comments was that Crystal had not spaced her children properly and that even if she had the income to support the ones in her care, she could not have the emotional energy to properly care for Samantha.
Gerald H.
Father had a one hour visit with Samantha in October 1995. Although DCF arranged a specific visitation schedule for him following that visit, he has never followed through and has had no contact with the child since his single visit with her almost three years ago. In addition, father has not contacted DCF to inquire about the child's well-being, has not contributed to Samantha's support and has not stayed in touch with his court appointed attorney or consistently kept his whereabouts known to DCF or his lawyer. When the social worker learned of his address from another source, she contacted him. Although he informed her as recently as October 1997 that he wanted to pursue visitation and custody, he never followed up on this with his attorney. Samantha does not know Gerald H., and in the past has referred to Todd G. as daddy." CT Page 9408
Samantha D.
Samantha was born on August 29, 1993, eleven days before her mother's fourteenth (14th) birthday. She was born at, 2 weeks gestation and weighed only 3 lbs, 14 oz. She was hospitalized for fifteen (15) days following her birth because she was unable to maintain her body temperature, had low blood sugar and was slightly jaundiced. She was first removed from her mother's care on a 96-hour hold on April 16, 1995, was returned on April 19. 1995, only to be removed again on May 25, 1995. She was approximately twenty (20) months old when she was removed and has been in foster care ever since. Samantha has resided with the same foster family in Enfield since April 1995, but they are not interested in adopting her at this time.
Samantha has been treating with Joan Prior of CSC from February to May 1997 and from November 1997 until the present. At the time of trial, Ms. Prior had seen her for a total of fifteen (15) sessions. Samantha was brought in for treatment because she was exhibiting regressed behaviors in the foster home including wetting her pants during the day when she previously was toilet trained. In addition, she was indiscriminately attaching herself to strangers by being overly affectionate with them. These behaviors created an initial impression of reactive attachment disorder — disinhibited type which Ms. Prior attributed to pathogenic care during infancy and early childhood as a result of being left with a number of caretakers and a lack of emotional or physical care. Samantha is really not bonded to anyone as a caretaker. When asked, Samantha could not identify anyone whom she would like to take on a trip. The only person she expresses care or affection for is her sister Kayla. She has only a superficial attachment to her foster mother. The foster care she is getting now is adequate but not the kind of care she needs to form a bond.
In March 1997, Ms. Prior sought to involve Crystal in Samantha's therapy. Crystal did not follow up on the therapist's recommendation that Crystal first engage herself in individual therapy and so has never participated in Samantha's treatment. Also in March 1997, Ms. Prior recommended that overnight visits be suspended because of Samantha's regressed behaviors concerning her toilet training. She was hoarding food and refused to eat after T.J. was born on March 10, 1997.
Samantha needs a great deal of physical and emotional care, CT Page 9409 more so than other children her age. She needs a caregiver who will talk to her, nurture her, encourage her developmental y be willing to involve herself with the child socially, express affection, work on her speech with her. Samantha's lack of attachment is her greatest problem in terms of future care. She requires a caretaker who will have to master patience, provide consistency of care, emotional availability, and a willingness to place the child's needs ahead of her own. She needs someone who can provide structure, limits and be nurturing and affectionate in an appropriate away. Samantha has a high potential for attachment but needs to be out of foster care to accomplish this. The longer she remains in foster care, the more difficult it will be for her to form an attachment that has any depth psychologically or emotionally.
Dr. Mantell evaluated Samantha on June 18, 1997, when she was three (3) years ten (10) months old. He found that her statements indicated multiple psychological parents including her mother, great grandmother and foster mother and that she exhibited behavioral signs of an emerging reactive attachment disorder (RAD). See Petitioner's Exhibit 2. As he testified at trial, he saw signs of RAD of a diffuse kind in subtle ways and based this opinion in part on reports from the foster mother and his own observations that Samantha makes superficial attachments to too many people because she has too many competing attachments. He stated his further view that Samantha's fluctuating visitation schedule with her mother has exacerbated the problem. As Samantha matures, unless her life circumstances allow her to develop more stable and permanent attachments she could develop a personality disorder or relationship disorders which may become intractable. Her greatest problem could become an inability to attach or relate to other adults. Although he did not perform an individual evaluation of Samantha, he based his opinion on his evaluation of Crystal and of Crystal and Samantha together and the written materials provided to him. The court adopts his recommendation that Samantha must have permanency so that she is not shuffling between different caretakers and accepts his view that if she remains in foster care her emotional problems will increase. The regression she experienced when visitation with mother was increased may relate to the fact that she was old enough realize that Kayla lived with Crystal and she did not. Based on his testimony, the court finds that Samantha must have a stable and parentally competent caretaker with a strong capacity to relate to meet her emotional needs who is able to successfully meet with professionals and do what needs to be done for this child. CT Page 9410 Because of her immaturity, rebelliousness, lack of insight, and responsibilities to three other very young children, based on reasonable medical certainty, Crystal will not be able to parent Samantha appropriately in the foreseeable future.
As Barbara O'Brien testified. Samantha is adorable has good peer skills and is in good health. Although her current foster family is not able to offer her a permanent home. Samantha at this age is very adoptable.
 II ADJUDICATION
The court finds from the foregoing facts by clear and convincing evidence that Samantha has previously been adjudicated as an uncared for child and, since the adjudication on October 5, 1995, the mother, Crystal D., has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, she could assume a responsible position in the life of Samantha. DCF has therefore established grounds for the termination of her parental rights in accordance with the provisions of Section 17a-112 (c)(3)(B) of the General Statutes. The court finds further by clear and convincing evidence that the circumstances giving rise to this ground have existed for more than one year. Samantha has been in foster care since May 25, 1995, when she was approximately twenty-one (21) months old. Although the child will be five (5) years old on August 29, 1998, her mother is not much closer to achieving stability in her life than she was when the 96-hour hold was invoked on April 16, 1995. Since that time, mother has had three more children who were all under the age of three at the time of trial. She had not yet attained a stable place to live for her children, having moved from place to place at least a dozen times. Since the court ordered formal expectations on October 3, 1996, which the mother signed on October 17, 1996 (Petitioner's Exhibit 7), Crystal failed to engage in the individual counseling that had been recommended to her since before Samantha's birth not only by DCF, but by Joan Prior, Samantha's therapist, Sherilyn Barao, the parent aide, others at CSC and Dr. Mantell. Crystal has not followed through with parenting classes or parenting counseling. Although there is evidence of a bond between Samantha and Crystal, visitation has often been disruptive to Samantha's well being and a continuing source of frustration for Crystal. Further, Crystal has had additional involvement with the criminal CT Page 9411 justice system and has not cooperated with the recommendations of DCF including their efforts early on to place her and Samantha together. Although at the time of trial, Crystal had achieved her GED, had steady employment and plans to enrolled in Branford Hall to train as a medical assistant, her efforts fall far short of being in a position to parent Samantha appropriately. As Samantha approaches her fifth birthday, it will be the fourth one which she will celebrate in foster care. This child simply cannot afford to wait any longer on the off chance that her mother will eventually be in a position to provide a stable and healthy home for her. She needs stability, permanency and parental emotional support now so that she has a viable chance of growing into a healthy adult unburdened by the severe abuse and neglect suffered by her mother. Crystal is overwhelmed by the circumstances of her past and present life and the court has serious concerns about her as to ability to care for the younger three children. Although Crystal testified that she hoped to regain custody of Samantha, it was painfully obvious that it was an impossible goal that she had no reasonable expectation of attaining.
As to the father Gerald H., the court finds by clear and convincing evidence that he has abandoned Samantha in the sense that he has failed to maintain a reasonable degree of interest, concern or responsibility as to her welfare and that there is no ongoing parent-child relationship with Samantha, that is, the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis, the physical, emotional, moral or educational needs of the child and to allow further time for the establishment of such parent-child relationship would be detrimental to the best interests of the child. Petitioner has therefore established grounds for the termination of the father's parental rights pursuant to Sections 17a-112 (c)(3)(A) (D) of the General Statutes. The court further finds by clear and convincing evidence that the circumstances giving rise to these grounds have existed for more than one year in satisfaction of the requirement set forth in Section 17a-112 (C)(3).[2]
Father had a one hour visit with Samantha in October 1995. Although DCF arranged a specific visitation schedule for him following that visit, he failed to follow up on it and has had no contact with the child since his single visit with her almost three years ago. In addition, father has not contacted DCF to inquire about the child's well-being, has not contributed to Samantha's support, has never appeared in court despite in hand service of this petition and was found in default on November 3, CT Page 9412 1997. Despite numerous efforts by his court-appointed attorney to contact him, father has not responded; neither has he kept his whereabouts known to DCF. When the social worker learned of his address from another source, she contacted him. Although he informed her as recently as October 1997, that he wanted to pursue visitation and custody, he never followed up on this with his attorney. Samantha does not know Gerald H., and in the past has referred to another man as her "daddy."
 III REASONABLE EFFORTS
Pursuant to Section 17a-112 (c)(1), the court also finds by clear and convincing evidence that DCF has made reasonable efforts to locate the father and to reunify the child with both parents. As to Gerald H., the court finds clear and convincing evidence, based on the foregoing findings, that Gerald H. has been unwilling to benefit from the reunification efforts.
As to Crystal D., the court finds by clear and convincing evidence that DCF has made reasonable and extensive efforts to reunify Crystal D. with Samantha by offering or providing the following services: parent aide services (Coalition for Children), November 1993 to September 1994, December 1994 to March, 1995; intensive family preservation services, placement in St. Agnes or CHAPS (either of which would have allowed her to provide a safe and stable living arrangement for both herself and Samantha); the Young Mother's Program at CSC; family counseling with Samantha at CSC; parenting classes through New Directions; parenting counseling and individual therapy at CSC; mentoring services through the Big Brother/Big Sister program; transportation services, child care services, child protection team services at CSC visitation; and finally, DCF case management and planning services. In addition, DCF has investigated other placement for Crystal and Samantha together for which Crystal did not qualify for one reason or another, including the Thames River Project in Norwich, Interim House in Winsted, Youth Continuum in New Haven and the Bridge in West Hartford.
 IV DISPOSITION
It is not sufficient to find that grounds for termination exist. The court must also find by clear and convincing evidence that a termination of parental rights is in the best interest of CT Page 9413 the child. In so doing, the court must also consider and make findings, pursuant to Section 17a-112 (e) of the General Statutes. Accordingly, the court finds by clear and convincing evidence, as follows:
1) Regarding the nature and timeliness of services offered by DCF, the court finds that appropriate, timely and extensive services were offered or provided in an effort to facilitate reunification of Samantha and her parents which have been detailed in Sections II and III of this opinion.
2) Regarding reasonable efforts toward reunification pursuant to the Federal Adoption Assistance and Child Welfare Act of 1980, the court has detailed and acknowledged the efforts of DCF previously in Sections II and III of this opinion and hereby finds reasonable efforts in accordance with this provision by clear and convincing evidence.
3) Regarding the terms of any outstanding court order. Mother signed expectations which were ordered by the court on October 3, 1996, and entered into evidence as Petitioner's Exhibit 7. The court finds by clear and convincing evidence that these expectations remain largely unfulfilled. Specifically, Crystal failed to engage in individual counseling or cooperate with parenting counseling or classes. She did not always keep her constantly changing whereabouts known to DCF or her service providers. She did not follow the recommendations of her service providers. She failed to achieve stable housing and has had additional involvement with the criminal justice system.
4) Regarding feelings and emotional ties, Dr. Mantell and Joan Prior found that Samantha has emotional ties to her mother, maternal great grandmother and foster mother, but no very strong ties to any one parental figure. They also found, however, that she has an emerging reactive attachment disorder and must have stability, permanency, competent parenting and emotional support in her life as soon as possible if she is to grow into a healthy adult. The court finds by clear and convincing evidence that Samantha has the ability to bond with a prospective adoptive family who has the ability to provide for her emotional needs.
5) Regarding the age of the child, Samantha will be five years old on August 29, 1998. She has been in foster care since the age of twenty-one months. She has never had a permanent home or committed, stable parenting. Although she has been in only one CT Page 9414 foster home, the family is unable to offer her adoption. Samantha is an adorable child in good health who is very adoptable at this age.
6) Regarding the efforts that the parents have made to adjust their circumstances to make it in the best interest of the child to return to their care in the foreseeable future. Crystal has had three more children since she lost custody of Samantha in May 1995. Mother has moved over a dozen times and still has not achieved stability. She has continued to involve herself with unstable and unsuitable men who do not support the children she has with them and who continue to involve her in the criminal justice system. The court therefore finds by clear and convincing evidence presented at trial and set forth in this opinion that Crystal's efforts to adjust her life's circumstances in an effort to return Samantha to her care have been meager at best and fall far short of the necessary mark to make her a worthy parent of this child. The court has already found that father has abandoned Samantha by clear and convincing evidence and therefore further finds that he has done nothing to adjust his life's circumstances on Samantha's behalf.
7) Regarding the extent to which either parent has been prevented from maintaining a meaningful relationship with Samantha by the unreasonable conduct of another person or by economic circumstances. The court finds by clear and convincing evidence that no other person has prevented either parent from having a meaningful relationship with Samantha. Both parents have only themselves to blame for their failed relationship with Samantha. Further, there have not been economic circumstances that have prevented them from doing what needed to be done to care for this child.
 V ORDER
The court, having weighed all statutory considerations and having found by clear and convincing evidence that grounds exist for termination of parental rights, further finds upon all the facts and circumstances presented by clear and convincing evidence that it is in the child's best interest to terminate the parental rights of Crystal D. and Gerald H. for the reasons previously expressed. Accordingly, it is hereby ordered that their parental rights in and to Samantha D. are hereby terminated. It is further ordered that the Commissioner of the CT Page 9415 Department of Children and Families is appointed the statutory parent for the purpose of securing an adoptive family or other permanent placement for said child. The Commissioner shall file with the Superior Court for Juvenile Matters a written report concerning permanent placement no later than ninety (90) days following the date of judgment, and file such further reports as are required by state and federal law.
Peck, J.
[2] Since the court finds DCF has proven abandonment and no ongoing parent-child relationship by clear and convincing evidence, there is no reason to reach DCF's claim of failure to rehabilitate as to father.